IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 02-cv-01632-MSK-MEH

WILLIAM MOWER,

   Plaintiff,

v.

CENTURY I CHEVROLET, INC., a Colorado corporation,
FOWLER HOLDING COMPANY, INC., a foreign corporation, d/b/a Fowler Auto Group, and
MICHAEL S. FOWLER, individually,

   Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR JUDGMENT AS
A MATTER OF LAW**

_____

**THIS MATTER** comes before the Court pursuant to the Defendants' oral motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, subsequently renewed (**# 138**) in writing at the close of trial; the Plaintiff's Motion for Damages and Entry of Judgment (**# 139**), the Defendants' response (**# 147**), and the Plaintiff's reply (**# 150**); the Defendants' Motion for Remittitur (**# 140**), the Plaintiff's response (**# 144**), and the Defendants' reply (**# 148**); the Plaintiff's Motion for Increased Damages Pursuant to C.R.S. § 13-21-102 and § 13-21-102.5 (**# 141**), the Defendants' response (**# 149**), and the Plaintiff's reply (**# 160**); the Defendants' Motion for Application of Statutory Caps (**# 142**), the Plaintiff's response (**# 145**), and the Defendants' reply (**# 159**); and the Defendants' Motion for Attorney's Fees Under the Colorado Wage Claim Act (**# 143**), the Plaintiff's response (**# 146**), and the Defendants' reply (**# 161**).

1

# I. BACKGROUND

This case arises from the Plaintiff's employment as Finance Director of Defendant Century Chevrolet ("Century"). In summary, in late 2000, the Plaintiff was diagnosed with cancer, and with Century's approval, took a three-month leave of absence to begin a two-phase treatment. During the first part of the treatment, a monthlong "infusion phase," the Plaintiff was largely incapacitated by side effects of the treatment, but performed some work from home. In December 2000, the Plaintiff began the second phase of the treatment (the "injection phase"), in which he self-administered smaller doses of the treatment a few times per week. The injection phase presented fewer and less severe side effects, and on January 2001, the Plaintiff returned to work full-time. However, upon returning to work, the Plaintiff experienced abusive treatment from John McCarthy, Century's General Manager, and in May 2001, the Plaintiff resigned his employment.

The Plaintiff presented three claims for relief: (i) disability discrimination, in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* ("ADA"), in that the Defendants reduced his pay and management responsibilities as a result of his disability; (ii) disability harassment in violation of the ADA, based on McCarthy's conduct; and (iii) outrageous conduct[1] under Colorado law, based on McCarthy's conduct and the reduction of his pay and responsibilities.

---

[1]The Plaintiff originally designated this claim as one for standalone constructive discharge under Colorado law. After the Court's summary judgment ruling (**# 49**) expressed doubt as to the viability of such a claim, the Defendants requested (**# 53**) that the Court clarify that it had dismissed the claim. The Court heard extensive argument on the Defendants' motion at the Final Trial Preparation Conference (**# 81**), and concluded that the Plaintiff was actually asserting an outrageous conduct claim, and that no prejudice would result to the Defendants from permitting a properly-designated claim to proceed to trial.

## II.  **EVIDENCE AT TRIAL**

Because resolution of the instant motions turns in large part on the evidence received at trial, a fairly detailed recitation of that evidence is necessary.

The Plaintiff's first witness was Kendra Ackerman, a former Finance Contractor at Century.  She reported directly to the Plaintiff.  Ackerman testified that McCarthy "very cocky" and "rude."  She testified that, before he was diagnosed with cancer, the Plaintiff would work five days a week, from 8:00 a.m. to 6:00 p.m., as well as mornings and afternoons on Saturdays. When the Plaintiff began working from home, Ackerman would communicate with him every day, including faxing him contracts.  However, upon instruction from Defendant Michael Fowler ("Fowler"), McCarthy told Ackerman not to fax contracts to the Plaintiff at home anymore. Ackerman saw the Plaintiff once while he was working form home, describing his appearance as "losing his hair, very, very thin" and that he was bleeding from a surgical incision in his chest. According to Ackerman, when the Plaintiff returned to work, he told her that McCarthy had insisted that he sign a modified pay plan before he would be permitted to start working again. Ackerman testified that when the Plaintiff returned to work, he did so "in the same attitude and the same way he did before he left," and that the only difference she observed in the Plaintiff's work upon returning was that McCarthy prohibited the Plaintiff from arranging financing with Primus bank, leaving Bill White solely responsible for contacts with that bank.

After the Plaintiff returned to work from his leave, Ackerman heard McCarthy call the Plaintiff "sickie" and "part time" and other disparaging names, but never his actual name. Ackerman testified that McCarthy told her that although the Plaintiff claimed to be getting cancer treatment, in actuality, he was on a "drunk binge" and did not actually have cancer.  Ackerman

3

also stated that, after his return to work, the Plaintiff would still leave work for chemotherapy treatments, and McCarthy instructed White to record the Plaintiff's comings and goings on a calendar. McCarthy's stated intention was to "blow him out"– that is, to fire him. Ackerman testified about overhearing a telephone call between McCarthy and Defendant Fowler, in which Defendant Fowler asked what was going on with the Finance Department, and McCarthy stated that he had informed the other finance employees that Defendant Fowler was "working on the Bill Mower issue from [Fowler's] end."   Ackerman associated this comment with a statement that McCarthy had previously made, in which McCarthy contended that Defendant Fowler was "taking care of pushing [the Plaintiff] out of the dealership."   Ackerman also testified as to a comment by McCarthy that the Plaintiff was "taking money out of [McCarthy's] pocket," in that the Plaintiff's salary was the equivalent of Ackerman and White's salaries combined.  Ackerman stated that when the Plaintiff returned to work after his absence, McCarthy told employees that Defendant Fowler didn't want the Plaintiff there and didn't want to pay his salary anymore. Ackerman described an event in which, after McCarthy had called him "sickie," the Plaintiff, teary-eyed, explained to her that he was embarrassed, but that he needed to keep his job for the insurance benefits.  Ackerman testified that she saw the Plaintiff running to the bathroom on occasion, that he couldn't eat or drink anything, and was losing his hair and losing weight, although her testimony on this point is not clearly localized to a particular timeframe.

Sherry Koepke, a former Special Finance Director, reported directly to the Plaintiff.  She testified that McCarthy was particularly health-conscious, working out as much as five to six times per day, and encouraging other employees to use herbal remedies.  Koepke corroborated Ackerman's testimony regarding the Plaintiff's work schedule before his illness.  Koepke

continued working with the Plaintiff when he began working from home during September -

November 2000.  Koepke testified that, although the Plaintiff was working from home during this

period, he was so available that "it was like he was working in the building."  Koepke saw the

Plaintiff at one point during this period, and testified that he was "sickly looking" and bleeding out

of his stomach.  Koepke stated that, when the Plaintiff returned to work in January 2001, he

resumed a work schedule that was similar to that which he worked before his illness, although he

would leave work at lunchtime to visit his doctor.  Koepke stated that, once the Plaintiff returned,

he was able to do his job just as well as before his illness.  Koepke testified that after the Plaintiff

returned to work, McCarthy allowed White to continue to perform some of the Plaintiff's duties,

which she believed indicated that McCarthy was trying to have White take over the Plaintiff's job.

Koepke testified that McCarthy was respectful of the Plaintiff before the Plaintiff's illness, but that

after the Plaintiff's treatment, McCarthy became verbally abusive, calling the Plaintiff "fucking

moron,"  "fucking idiot," "fucking stupid," "sickie," "old man," and "cripple."  Koepke overheard

a conversation between McCarthy and another Century employee in which McCarthy stated aloud

"we got to get rid of this F-ing Mower."  She also testified that she was told by McCarthy that the

Plaintiff did not actually have cancer, but was lying to his wife so he could go out of state or was

trying to work a second job.  Koepke also said that McCarthy complained that the Plaintiff's

cancer was "cramping [McCarthy's] income," and that Century should not keep paying the

Plaintiff.

Koepke also testified to overhearing a phone call between McCarthy and Defendant

Fowler.  Koepke stated that she heard Defendant Fowler ask McCarthy if he was keeping track of

the Plaintiff's hours, to which McCarthy responded that he had the calendar "right here."  On

cross-examination, Koepke testified that other people besides McCarthy called the Plaintiff "old man," and that other employees also called him "dad."

The next witness was Dr. William Lee, the Plaintiff's treating physician.  Dr. Lee testified that the Plaintiff was referred to him in June 2000, after a biopsy on a skin irregularity taken from the Plaintiff revealed malignant melanoma.  At the time Dr. Lee first met the Plaintiff, the Plaintiff was complaining of chronic fatigue and weight loss, among other medical ailments.  Dr. Lee referred the Plaintiff for a lymphatic biopsy in early July 2000, which revealed that the cancer had spread.  Dr. Lee diagnosed the Plaintiff with Stage 3 cancer, and a statistical likelihood of survival at less than 50%.  Dr. Lee then recommended that the Plaintiff undergo chemotherapy in the form of high-dosage Interferon, and on September 12, 2000, the Plaintiff began that treatment.  Dr. Lee testified that, up until this point, he considered the Plaintiff to be capable of working at his job.

The initial Interferon treatment, the "infusion phase," lasted four weeks, requiring the Plaintiff to go to Dr. Lee's office each weekday for half-hour injections of the drug through a port surgically inserted under the Plaintiff's shoulder.  Dr. Lee explained that the side effects of Interferon are like "the worst flu [a patient] has ever had."  During the infusion phase, a patient would be expected to experience achiness, fevers, "be incredibly tired," and suffer muscle and joint pain.  In the Plaintiff's case, Dr. Lee specifically observed that the Plaintiff was fatigued, experienced muscle aches, and fevers.  On one occasion, the Plaintiff reported to Dr. Lee that he was short of breath, but Dr. Lee eventually concluded that this problem was related to the Plaintiff being tired because of the Interferon.   Similarly, the Plaintiff reported to Dr. Lee on "a couple of occasions" that he was having difficulty walking or maintaining balance, which Dr. Lee attributed

to being the result of muscle weakness from the treatment.[2]  Dr. Lee stated that, during the

infusion phase, he encourages patients not to work, and that he is "amazed" when some patients

continue to work nevertheless.

Once the infusion phase is complete, Dr. Lee places patients on a 48-week "injection"

phase, where the patient is responsible for self-injecting smaller doses of Interferon three days per

week.  Dr. Lee testified that, although the injection phase is "rigorous," most patients are able to

return to work during it.  Dr. Lee testified that, like many patients, the Plaintiff did not complete

the full course of the injection phase.  He completed the infusion phase on October 18, 2000, took

a brief break,[3] and began the self-injections on December 5, 2000, before ending the treatment in

March 2001.  Dr. Lee explained that the same side effects occur during the injection phase as

during the infusion phase, but they are not as severe during the injection phase.  The Plaintiff's

counsel drew Dr. Lee's attention to a letter he wrote to the Defendants in December 2000

concerning the Plaintiff at the beginning of the injection phase.  In that letter, Dr. Lee explains that

"without question, this therapy is necessary and the side effects will impact on his ability to

perform his activities of daily living throughout the duration of treatment."  At the Plaintiff's

---

[2]At this point in Dr. Lee's testimony, the Plaintiff's counsel inquired as to the effect of the Interferon treatment on patients' ability to care for themselves, to perform manual tasks, and on the patients' emotional state. The questions and answers in this portion of the testimony are ambiguous as to whether the Plaintiff's counsel was inquiring about the effects on patients generally, or the effects that Dr. Lee observed with regard to the Plaintiff specifically.  Dr. Lee's answers appear to be referring to the general experiences patients have, not that the Plaintiff himself actually indicated suffering these particular effects.

[3]Dr. Lee testified that the side effects from the Interferon treatment typically lasted approximately a month past the end of the patient's use of the drug.

request, Dr. Lee wrote another letter in December 2000, explaining that the Plaintiff could work from 8:00 a.m. to 5:00 p.m. during the week, and half-days on Saturdays.

The Plaintiff's counsel inquired of Dr. Lee whether the side effects of Interferon treatment would affect the ability of a person to take care of themselves, and Dr. Lee testified that it would. The Plaintiff's counsel also inquired whether that effect "would be more so than the average person in the general population could take care of themselves." After an objection, the Plaintiff's counsel rephrased the question as whether Dr. Lee had an opinion "that the side effects of these treatments would affect Mr. Mower more so than the average person in the general population could take care of themselves." Dr. Lee responded "Yes. When compared to the general public this -- I'm sorry. The question has gotten so long now. This is much more severe than a person who isn't undergoing Interferon, not to be questioned." The Plaintiff's counsel asked whether high doses of Interferon "significantly impact someone's ability to perform manual tasks" when compared to the general population, to which Dr. Lee responded affirmatively. Dr. Lee gave a more qualified answer to a similar question about the treatment affecting an individual's ability to walk, observing that the fatigue associated with the drug might affect one's ability to walk, but that most patients taking Interferon are not directly affected in their ability to walk. The Plaintiff's counsel closed the direct examination of Dr. Lee by asking "within a reasonable degree of medical certainty, did it affect Bill Mower's activities," to which Dr. Lee responded "It probably did, yes."

On cross-examination, Dr. Lee explained that his assessment of the extent of side effects from the treatment comes primarily from those complaints that the patient subjectively describes. He also acknowledged that Interferon affects different people in different ways. Defense counsel

8

reviewed certain medical records from Dr. Lee's consultations with the Plaintiff, noting that on September 25, 2000, the Plaintiff reported feeling like he had a "chronic hangover," wheezing, a productive cough, fever, and chills.  Dr. Lee's next examination of the Plaintiff was on October 25, 2000, after the infusion phase had completed, at which time the Plaintiff reported feeling worse, including fatigue and weakness.  Dr. Lee testified that he would be surprised if side effects intensified after the end of treatment, and wondered whether the Plaintiff had a cold or other illness that was responsible for the symptoms.  Dr. Lee saw the Plaintiff again on November 9, 2000, at which time the Plaintiff reported feeling much better, and shortly thereafter, Dr. Lee began the injection phase.  Dr. Lee's first exam of the Plaintiff during the injection phase was December 20, 2000, at which time the Plaintiff reported many of the same side effects he had experienced during the infusion phase, although he reported that he was tolerating them better.  In an examination on January 10, 2001, the Plaintiff reported to Dr. Lee that he had previously been seen in an emergency room for diarrhea, dizziness, shortness of breath, and chest pain.  Dr. Lee stated that such symptoms were not typical for Interferon use, but that he nevertheless suspected that these symptoms were related to the treatment.  The Plaintiff was still reporting typical side effects at his examination on February 15, 2001.  The Plaintiff's final examination by Dr. Lee was on April 4, 2001, at which time he reported to Dr. Lee that he could no longer tolerate the side effects, that he had ceased the injections nearly a month earlier, and that he was feeling much better, reporting no ongoing side effects.  Dr. Lee acknowledged that he could recall no detailed information that the Plaintiff may have conveyed to him regarding the extent to which the Plaintiff was experiencing difficulty caring for himself or performing manual tasks during treatment.

At the conclusion of Dr. Lee's testimony, the parties agreed to permit the Defendants to call witness Jerry Johnson out of order.  Johnson was General Manager at Century prior to McCarthy's arrival.  Johnson hired the Plaintiff as Finance Director, and offered him a compensation package that consisted of both a guaranteed salary and a percentage of the gross profits in the finance department.  Johnson testified that the Plaintiff told him that McCarthy treated him harshly and called him derogatory names, including "sickie," but Johnson had no recollection of the Plaintiff ever claiming that he felt discriminated against.

The Plaintiff then called Tom Korjenek, Century's former Comptroller and an officer of Defendant Fowler Holding Company.  Korjenek testified that it was painful to watch the Plaintiff going through treatment, and that he and others were afraid that the Plaintiff was going to die.  Korjenek testified regarding a written addendum to the Plaintiff's compensation plan, which acknowledged the parties' mutual understanding that the Plaintiff could not perform his position on a full-time basis during the months of September, October, and November 2000, and that instead of his regular compensation during this period, he would be paid a flat  $10,000 per month.  Johnson testified that in December 2000, McCarthy informed him that the Plaintiff had indicated his intention to return to work, but that McCarthy was leery that, as a result of his cancer, the Plaintiff would be unable to perform his regular job duties.  Korjenek attended a meeting with McCarthy and the Plaintiff in which McCarthy asked the Plaintiff to provide a work release from his doctor.  Following that meeting, Korjenek had a discussion with McCarthy in which McCarthy questioned whether the Plaintiff was actually ill.  Korjenek also stated that he and McCarthy had several discussions with Defendant Fowler about the Plaintiff returning to work, although the testimony does not elaborate on the content of those discussions.

10

Korjenek testified that after the Plaintiff obtained the release from his doctor that McCarthy demanded, they had another meeting at which time the Plaintiff was told he was allowed to return to work, but McCarthy insisted, over the Plaintiff's objection, that the Plaintiff agree to an adjustment of his compensation plan. The Plaintiff's new compensation would be a flat $ 8,500 per month salary, less sick days, and with no commission. Korjenek testified that McCarthy asked him to log the Plaintiff's comings and goings, but Korjenek refused. Korjenek acknowledged that other employees came to him with complaints that McCarthy was making inappropriate comments to the Plaintiff, and that on several occasions, Korjenek himself informed Defendant Fowler and the Defendants' attorneys of his concerns about McCarthy's mistreatment of the Plaintiff. Korjenek admitted that, despite the Defendants' anti-harassment policy, the Defendants permitted McCarthy to harass the Plaintiff.

On cross-examination, Korjenek testified that he could not recall details about his observations of the Plaintiff during the infusion phase treatments, and that he could only recall indistinctly an occasion during the injection phase where the treatment left the Plaintiff "very tired." Korjenek testified that the decision to pay the Plaintiff during September - November 2000 was Defendant Fowler's. Korjenek testified that he opposed paying the Plaintiff for not working, believing it would set a bad precedent, but that Defendant Fowler stated that it was the right thing to do. Korjenek also stated, apparently in contradiction of his earlier testimony, that he recalled it was the Plaintiff who first proposed the idea of lowering his salary upon his return to work Korjenek confirmed that McCarthy would refer to the Plaintiff as "old man," but denied hearing any other employee refer to the Plaintiff that way, and denied ever hearing McCarthy refer to the Plaintiff as "sickie."

Troy Segal, the General Sales Manager at Century, offered testimony as to the Plaintiff's hours and work habits before, during, and after his medical leave that was consistent with other witnesses' testimony on these subjects. Segal affirmed that McCarthy used abusive language towards employees, and Segal complained to Korjenek about it. On cross-examination,[4] Segal estimated that, after returning from his treatment, the Plaintiff worked slightly fewer hours – perhaps 5 to 10 hours per week – than he had done previously. Segal also confirmed that Bill White also performed some Finance Director duties during this time.

The Plaintiff called Sandra Merkel, Century's Comptroller, and its former Human Resources and Office Manager. Merkel confirmed that the Plaintiff's personnel file contained only one disciplinary notice, from March 2001, in which the Plaintiff was criticized for not bringing certain problems to McCarthy's attention, but that the file contained no criticism of the Plaintiff's attendance, work habits, or any other aspects of his performance. Merkel also testified about some health insurance forms in which Century acknowledged that the Plaintiff had been actively at work throughout his illness. She testified that McCarthy was not given a handbook or formal training about discrimination, but that he was required to read and sign Century's anti-harassment policy, although Merkel was unable to locate a copy signed by McCarthy. Merkel testified that, if an employee felt harassed by the General Manager, the Defendants' anti-

---

[4]For purposes of efficiency, the Defendants conducted their direct examination of Segal immediately after finishing his cross-examination. This testimony established that Segal never heard McCarthy make certain specific derogatory comments towards the Plaintiff, and that the Plaintiff and McCarthy verbally "jousted" with each other, calling each other "old man." Segal testified that the Plaintiff was present at Monday morning management meetings throughout his employment. Segal stated that the Plaintiff occasionally used "foul language" with his subordinates, and gave an example of the Plaintiff referring to them as "maggots." Segal acknowledges that no employee complained about this conduct.

harassment policy required the employee to contact her, the Office Manager.  She stated that once she learned of possible harassment, she had a duty to investigate, even if the victim did not specifically complain about it.  Merkel denied ever having an employee advise her that McCarthy was treating the Plaintiff badly, but acknowledged that she had heard "gossip" to that effect and that Korjenek once told her that McCarthy and the Plaintiff were "hollering" at each other.  Merkel did not take action with regard to the "gossip" because she believed the Plaintiff had a "strong enough personality" that he would come to her if he wanted her to investigate anything.  On cross-examination, Merkel testified about the March 2001 meeting in which McCarthy issued the warning notice to the Plaintiff, stating that McCarthy spoke in a "firm" voice to the Plaintiff, but did not yell at him.[5]

Paul Cadorette testified as an expert for the Plaintiff on the issue of damages.  He opined that the Plaintiff suffered economic losses for commissions charged back to him in the amount of $ 4,685; for wage loss resulting from his reduced pay after returning from leave in the amount of $ 44,338; and for future losses in the amount of $ 870,168; for a total economic loss of $919,190.  On cross-examination, Cadorette testified that he updated his calculation of the Plaintiff's economic loss in March 2005, concluding that, based on the Plaintiff's subsequent employment, the Plaintiff's total economic loss was reduced to $ 377,167, with no loss of earning power after

---

[5]The Defendants then proceeded to conduct their direct examination of Merkel, who testified that Defendant Fowler Holding Company was self-insuring its employee's health coverage at the time of the Plaintiff's employment, but that neither Century nor its employees were advised of claims by employees under the health insurance plan.  Merkel testified that she did not observe McCarthy and the Plaintiff interacting very often, and she never heard McCarthy use abusive language towards the Plaintiff or questioning his health.   Merkel stated that the Plaintiff never complained to her that he felt he was being discriminated against.  On cross-examination, Merkel testified that McCarthy's pay turned, in part, on the profits made by Century, and that expenses resulting from employee benefits have an effect on Century's profits.

September 2004.  On re-direct examination, Cadorette testified that his March 2005 calculation turned on the fact that the Plaintiff had been employed at another car dealer, and that subsequent to that calculation, the Plaintiff left that dealer, and thus, Cadorette felt that his initial $900,000 calculation was a more correct assessment of the Plaintiff's damages.

Bill White testified by deposition.  White testified that he was asked to be Finance Director while the Plaintiff was on leave, and that the Plaintiff worked from home during that time, faxing paperwork to White.  The Plaintiff would come to the office occasionally during his treatment, and White testified that he had lost weight and color in his skin and that his energy level was down.  White stated that he heard McCarthy call the Plaintiff derogatory names such as "sickie" and "old man," but stated that everybody called the Plaintiff "old man."  White testified that McCarthy also referred to the Plaintiff as "fucking idiot" and "fucking asshole," but that McCarthy used similar language when referring to other employees.  White stated that he heard McCarthy say that he wanted to get rid of the Plaintiff, and that "we didn't need him."  White was asked by McCarthy to keep track of the Plaintiff's coming and going.  White stated that, after his return to work, the Plaintiff worked 1-2 hours per day less on weekdays and reduced the number of times he came in on Saturdays.  White testified that he believed the Plaintiff was capable of doing the Finance Director job when he returned from leave, and that McCarthy's request that White continue to perform Finance Director duties thereafter "could be" because McCarthy wanted White to take the Plaintiff's place.  White confirmed that McCarthy stated that the Plaintiff did not have cancer and was "faking it."   White testified that McCarthy included the Plaintiff in management discussions less often after he returned, and stated that he heard McCarthy refer to the Plaintiff as "sickie" a dozen times.

14

The Plaintiff then called Tyele Mower, the Plaintiff's wife.  She testified that when the Plaintiff started chemotherapy, he lost weight, was despondent, and had difficulty walking and climbing stairs.  She stated that, on a couple of occasions, she would come home from work to find that the Plaintiff had soiled himself from diarrhea induced by the chemotherapy.  She testified that the Plaintiff was "feeling better" after the infusion phase completed, and that he was looking forward to returning to work.  She stated that, during the injection phase, the Plaintiff was "very tired" and became tired faster, but that the symptoms were less severe than during the infusion phase.  She stated that the Plaintiff was often depressed because of the treatment he received from McCarthy upon returning to work.  She testified that the Plaintiff stopped taking his injections in March 2001, and that within two months, he was physically stronger and could remain longer at work, but that he was still depressed because of McCarthy's treatment of him.

The Plaintiff testified that his initial compensation plan was 8½% commission, with no provision for charge-backs, and a $9,000 per month guarantee.  He testified that after being diagnosed with cancer, he underwent surgery, and then began the infusion phase.  He described the side-effects of the infusion phase as being "your worst flu and times it times 100, that's what it is, every day, right through the night."  He testified that he had cold and hot spells, weakness, nausea, headaches, and no appetite.  He stated that the treatment affected his ability to walk because he would frequently pass out.  He stated that it affected his ability to breathe, to sleep, and to think clearly.  When he switched to the injection phase, he still had some of the same side effects, including hot and cold spells and sickness.  He acknowledged that during September, October, and November 2000, he agreed to accept a flat $10,000 in lieu of his regular

15

compensation, and that he intended to return to his regular pay thereafter.  He continued to work from home during this period.

The Plaintiff called McCarthy just prior to December 1, 2000, expressing his intent to return to work.  McCarthy told him that Century was not ready for him to come back.  The Plaintiff stated that the law required Century to allow him to return to work, to which McCarthy responded "I am the law."  The Plaintiff attempted to call McCarthy repeatedly thereafter, but McCarthy refused to return some 50 messages left by the Plaintiff.  McCarthy eventually called the Plaintiff, telling him that there was no longer a Finance Director job for the Plaintiff to fill, and that he could return to work as a salesman.  The Plaintiff arranged a meeting in person with McCarthy and Korjenek, at which time McCarthy offered him his Finance Director position, but at a flat salary of $ 8,500 per month because, McCarthy said, the Plaintiff would not be working regular hours.  The Plaintiff accepted McCarthy's offer and returned to work in January 2001, working the same hours he had done previously.

He testified that his relationship with McCarthy had been cordial until his illness, at which time McCarthy "went 180 degrees," referring to him as "sickie" over the dealership's intercom and calling him "idiot," among other things.  The Plaintiff testified that he was called names by McCarthy every day and was excluded from management decisions he was previously consulted on.  McCarthy often asked him if he was pretending to be sick, or referred to "that piece of cloth around your waist with ketchup on it," referring to a time when the Plaintiff was bleeding from his stomach.  On one occasion, when the Plaintiff was in the bathroom feeling sick, McCarthy came in, again accusing the Plaintiff of not being ill.  The Plaintiff stated that "you're not going to make me quit," to which McCarthy responded "yes, I will."  McCarthy would "flip [the Plaintiff] off"

often, and would often ignore requests to meet with the Plaintiff about business.  The Plaintiff complained about his treatment to Korjenek, who said he would call Defendant Fowler, but no investigation was ever conducted.  Korjenek also told the Plaintiff that he had spoken to the company's lawyers about the matter.

On cross-examination, the Plaintiff acknowledged that he never complained about McCarthy's treatment to anyone other than Korjenek.  He stated that the side effects from the treatment during the injection phase would last six to seven hours, and would then abate.

After the Plaintiff's testimony, the Plaintiff rested his case.  The Defendants then called Defendant Fowler, the President of Century.  Fowler testified that the General Manager of Century is responsible for day-to-day operations of the dealership, which include "employee satisfaction."   The General Manager does not have the authority to hire and fire employees, but may recommend to Fowler that employees be hired or fired.  Fowler testified that he, as President, was responsible for determining what duties were to be performed by the Finance Director, and that he expected the Finance Director to work "from open to close" – that is, 8:30 a.m. to as late as 11:00 p.m. – "five days a week including Saturdays," although he then testified that, on average, a Finance Director would work anywhere from 55 to 70 hours per week.

Fowler described a conversation with the Plaintiff in August 2000 in which the Plaintiff informed Fowler of his diagnosis, that he would be off work for three to six months undergoing treatment, and that the treatment would result in side effects resembling "the most severe flu that you could possibly have."  Fowler asked the Plaintiff to advise him how much money the Plaintiff needed during this period to get by, and they eventually agreed to pay the Plaintiff a $10,000

salary per month for September - November 2000.  It was Fowler's understanding that the Plaintiff would not be performing any work during this period.

In December 2000, Fowler had a telephone conversation with the Plaintiff in which the Plaintiff stated that he was feeling better and ready to return to work, but that McCarthy was not returning his phone calls.  Fowler then called and spoke to McCarthy, and McCarthy faxed a letter, Exhibit 7, to him.  Exhibit 7 was Dr. Lee's initial letter clearing the Plaintiff to return to work, but Fowler felt that the letter was not specific enough about what the Plaintiff would and would not be able to do during the injection phase of his treatment.  Fowler contacted McCarthy, and instructed McCarthy to obtain something more specific from the Plaintiff.  In response, Fowler received a second letter from Dr. Lee, dated December 11, 2000, which advised that the Plaintiff could work from 8:00 a.m. to 5:00 p.m. on weekdays and some Saturdays.  Fowler believed that this schedule would not permit the Plaintiff to accomplish all of the Finance Director duties.  Fowler testified that, in a subsequent telephone conversation with the Plaintiff, the Plaintiff proposed reducing his pay to $ 8,500 per month to compensate for his reduced schedule.  In addition, Fowler testified that they discussed the Plaintiff's treatment, and that the Plaintiff would continue to suffer "side effects very similar to the effects of the injections (sic) he had been taking."  Fowler stated that the Plaintiff never asked any questions about the revised pay plan before signing it on December 28, 2000.

Fowler reviewed some documents and identified a $1,000 bonus that was given to the Plaintiff by McCarthy in March 2001.  Fowler testified that he had as many as 16 conversations with the Plaintiff between his return to work in 2001 and his resignation on May 7, 2001, and that the Plaintiff never complained to him about the treatment he was receiving or about his

compensation, no other employee ever complained to Fowler about McCarthy's treatment of the Plaintiff, and Fowler himself never observed any mistreatment of the Plaintiff by McCarthy. Fowler stated that he did have conversations with the Plaintiff about the Plaintiff's side effects after he had returned to work, and the Plaintiff complained of fatigue, vomiting, diarrhea, and achiness in his legs.  Fowler then testified about a discussion he had with Tim Krejci, a consultant hired by Century to review certain management practices.  Krejci informed Fowler that his investigation had revealed that the Plaintiff had used unprofessional language with the Sales Department, and that Krejci was recommending a change of position for the Plaintiff.  However, Fowler never took any action on Krejci's recommendation.

On cross-examination, Fowler acknowledged that, although he did not believe the Plaintiff would be working during his leave from work, Fowler arranged to have a fax machine installed at the Plaintiff's house.  He stated that the request for the machine came from the Plaintiff through McCarthy.  Fowler also acknowledged that he had given testimonials to Krejci's consulting company that the company used in its advertising.

At the conclusion of Fowler's testimony, the defense rested.  The Plaintiff testified in his rebuttal case, denying that Fowler had ever called him during his leave to check on his condition, denying that he had any discussions with Fowler when he was attempting to return to work, and denying that the modification to his pay plan upon his return was his idea.  The Plaintiff also denied that he had spoken to Fowler 16 times between his return to work and his resignation, stating that, at best, he spoke to Fowler once during that period.

## III.  DEFENDANTS' RULE 50 MOTION

Both sides rested, and the Defendants moved for judgment as a matter of law pursuant to

Fed. R. Civ. P. 50.  Addressing the Plaintiff's disability discrimination and disability harassment

claims, the Defendants contended that the Plaintiff was not "disabled," as that term is defined in

the ADA.  Although they acknowledged that his cancer constituted a physical impairment under

the ADA, they argued that the Plaintiff had not shown that his cancer substantially limited any of

the Plaintiff's major life activities.  Specifically, they contended that although the Plaintiff claimed

to be impaired in the activities of caring for himself, walking, breathing, and performing manual

tasks, he had not offered evidence to show that the extent of that impairment was significantly

different from the average person's ability to perform those tasks.  The Defendants further argued

that the Plaintiff did not have a record of a disability, nor was he regarded by the Defendants as

having a disability.  In addition, the Defendants moved for judgment in their favor on their

affirmative defense to the disability harassment claim – the defense that they had an available

policy for reporting harassment, but that the Plaintiff unreasonably failed to use it.  Finally, the

Defendants argued that Plaintiff's outrageous conduct claim was not supported by evidence,

apparently because the Plaintiff did not suffer severe emotional distress as a result of the conduct.

The Court reserved ruling on the Defendants' motion, and submitted the case to the jury.

## IV.  VERDICT

The jury returned a verdict (**# 136**) in favor of the Plaintiff on all three of his claims.  On

his claim of disability discrimination, the jury found that the Plaintiff had sustained economic

losses of $300,000, and non-economic losses of $100,000.  On the claim of disability harassment,

the jury found that the Plaintiff had sustained economic losses of $200,000 and non-economic

losses of $250,000.  The jury also rejected the Defendants' affirmative defense, finding that

Century did not exercise reasonable care to prevent and correct harassment.  On the claim for

outrageous conduct, the jury found that the Plaintiff sustained an economic loss of $200,000 and

a non-economic loss of $400,000.  Although the jury was instructed not to simply aggregate their

findings of economic loss and were to only award damages once for injuries sustained as the result

of multiple claims, the jury's award of damages appears to be the cumulative total of all of its

economic and non-economic loss figures – a total of  $700,000 in economic losses and $750,000

in non-economic losses.  The jury also found predicates for an award of punitive damages under

both the ADA and in tort, and awarded $500,000 in punitive damages on the ADA claims and

$800,000 in punitive damages on the tort claim.

## V.  POST-TRIAL MOTIONS

The parties then filed the instant post-trial motions.  The Defendants filed a Renewed

Motion for Judgment as a Matter of Law **(# 138)**, which merely requests a ruling on their still-

pending oral motion.  The Defendants also filed a Motion for Remittitur **(# 140)**, on the grounds

that the jury's damage awards were inconsistent with the facts and instructions given to the jury.

The Defendants further moved **(# 142)** for the Court to apply federal and state statutory caps on

the various damage awards, and moved for an award of attorney's fees **(# 143)** on the Plaintiff's

claim under the Colorado Wage Claim Act on which the Court granted summary judgment to the

Defendants.

The Plaintiff filed a Motion Re: Allocation of Damages and Entry of Judgment **(# 139)**,

requesting: (i) that the Court apply the most lenient damages caps to the Plaintiff's ADA award

based on the total number of employees of all holding companies overseen by Defendant Fowler

21

Holding Co.; (ii) that the Court apportion the jury's damage award between federal and state claims so as to maximize the Plaintiff's recovery; (iii) that the Court exercise its discretion to increase the statutory cap on non-economic damages under Colorado state law; (iii) that the Court find that the Plaintiff's actual damages exceeded $800,000 for purposes of applying Colorado law that limits punitive damage awards to the amount of damages actually awarded to a plaintiff on the relevant claim; (iv) that the Court award prejudgement interest; and (v) that the Court award attorney's fees and costs.

The Plaintiff also filed a Motion to Increase Noneconomic and Punitive Damages pursuant to C.R.S. § 13-21-102 and § 13-21-102.5 (**# 141**).  That motion argues that Colorado law permits the Court to increase an award of punitive damages to three times the amount of actual damages in certain circumstances under C.R.S. § 13-21-102(3), and permits the Court to triple the statutory cap on non-economic damages under C.R.S. § 13-21-102.5(3)(a).[6]  The Plaintiff requests that, based on the evidence at trial, the Court exercise its discretion under both statutes.

## VI.  ANALYSIS

### A. Defendants' Rule 50(a) Motion

In adjudicating the Defendants' motion for judgment as a matter of law under Fed. R. Civ. P. 50(a), the Court views the evidence in the light most favorably to the Plaintiff. *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1089 (10th Cir. 2001); *Aquillino v. University of Kansas*, 268 F.3d 930, 933 (10th Cir. 2001).  The Court may grant the motion only if the evidence points but one way and is susceptible to no reasonable inferences which may support the Plaintiff's position

---

[6]The request to exceed the cap on non-economic damages is the same relief requested in the Plaintiff's "motion . . . for entry of judgment."

and the law compels a judgment in favor of the Defendants.  *Id.*; *Bristol v. Board of County Commissioners of County of Clear Creek*, 281 F.3d 1148, 1161 (10th Cir. 2002).

1.   Whether the Plaintiff is covered by the ADA

To be eligible for protection under the ADA, the Plaintiff must be a "qualified individual with a disability."  42 U.S.C. § 12112(a).  The statute defines a "disability" in three alternative ways: that the individual has (i) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (ii) a record of having such an impairment; or (iii) is "regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).  All three alternatives turn on whether a person has, had, or is regarded as having, an impairment[7] that "substantially limits a major life activity."  A "major life activity" is not statutorily defined, but both the Equal Employment Opportunity Commission ("EEOC") and the courts have defined the term as including "caring for oneself, performing manual tasks, walking, seeing, breathing, learning, and working."  *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 610 n. 11 (10th Cir. 1998), *citing* 29 C.F.R. §1630.2(i).[8]  In response to the Defendants' oral motion, the Plaintiff identified

---

[7]The parties agree that cancer is a physical impairment.  However, there is no evidence that the Plaintiff's cancer, of itself, affected any of the Plaintiff's major life activities.  Rather, the Plaintiff's various limitations resulted as side effects from the treatment he underwent to mitigate that cancer.  Nevertheless, the Court considers the physical limitations resulting from the treatment to be a limitation resulting from the impairment itself.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) ("if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is 'substantially limited' in a major life activity").

[8]Both the Supreme Court and 10th Circuit have questioned the amount of weight to be given to the EEOC's regulations.  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 194 (2002); *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 496 (10th Cir. 2000).  Nevertheless, both courts have given some consideration to the regulations in their analyses in numerous cases,  and thus, this Court will do so as well.

the following of his major life activities that he contends were impaired: breathing, walking, balance, caring for himself, performing manual tasks, thinking, sleeping, and interacting with others.

Breathing, walking, caring for oneself, and performing manual tasks are clearly major life activities. *Nielsen*, 162 F.3d at 610 n. 11. Sleeping is also recognized as a major life activity. *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 496 (10th Cir. 2000); *Steele v. Thiokol Corp.* 241 F.3d 1248, 1253 (10th Cir. 2001), *citing Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999). The 10th Circuit has been less clear in addressing whether thinking and interacting with others should be considered major life activities, but it has treated them as such for argument's sake. *See Doyal*, 213 F.3d at 496; *Steele*, 241 F.3d at 1253. No court has clearly addressed whether balancing is a major life activity. It would appear to this Court that balancing is not a major life activity on its own, but rather, a component of other activities, such as walking and caring for oneself. Here, the Plaintiff's balance problems form the basis of his claim that his ability to walk was impaired, and thus, the Court will not consider balancing as a separate life activity.

The Court must then determine whether there is sufficient evidence that the Plaintiff was "substantially limited" in one or more of these activities.[9]  To be "substantially limited" in an activity, the Plaintiff must be "severely restrict[ed]" or restricted "to a large degree" in his ability to perform the major life activity. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 196-97, 198

---

[9]Ordinarily, questions of whether an individual has a physical or mental impairment, and whether a given activity constitutes a major life activity under the ADA present question of law for the Court, while the question of whether an individual is substantially limited in an identified major life activity presents a question of fact for the jury. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129-30 (10th Cir. 2003). Nevertheless, in proper circumstances, such as on a motion for summary judgment or Rule 50 motion, the Court can decide the issue of substantial limitation as a matter of law. *Id.* at 1130 n. 5.

(2002).  The EEOC's regulations suggest that the benchmark for measuring the extent of the

Plaintiff's restriction is the extent to which the average person in the general population can

perform the activity.  29 C.F.R. § 1630.2(j)(1)(ii).  The EEOC's regulations also posit that

"several factors should be considered in determining whether an individual is substantially limited

in a major life activity.  29 C.F.R. § 1630.2(j)(2).  Those factors include: (i) the nature and

severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the

permanent or long-term impact, or the expected permanent or long-term impair of or resulting

from the impairment. *Id.*  The Supreme Court has cited the second and third factors with

approval, stating that "[t]he impairment's impact must also be permanent or long term. *Toyota*,

534 U.S. at 198. [10]

        Before turning to the specific major life activities cited by the Plaintiff, the Court makes

several general observations about the scope of the evidence presented.  First, the nature and

extent of the Plaintiff's impairment varied over time.  During the infusion phase, the Plaintiff was

more severely affected by side effects.  This phase was of particularly short duration, lasting two

months – one month of treatment and one month of residual effects as the drug left his system.

During the injection phase, the Plaintiff was still affected by side effects, but to a much lesser

degree.  During this phase, the Plaintiff was able to return to work full-time and to resume the

same level of work activity that he had prior to his illness.  All of the actionable events in this case

--------

[10]The Supreme Court's reference to these factors occurs in conjunction with a reference to
the major life activity of performing manual tasks.  534 U.S. at 198 ("We therefore hold that to be
substantially limited in performing manual tasks, an individual must have an impairment . . .
[whose] impact must also be permanent or long term.").  However, there is no reason to believe
that the Supreme Court intended this holding to be limited only to the major life activity of
performing manual tasks. *See e.g. Haynes v. Williams,* 392 F.3d 478, 483 n. 4 (D.C. Cir. 2004).

– the reduction in pay, the exclusion from management meetings, and the harassment by McCarthy – occurred during the injection phase, when the Plaintiff's impairments were at a reduced level.

Second, the injection phase was scheduled to last 48 weeks, but the Plaintiff underwent injections only from December 5, 2001 to early March 2001; the side effects had completely abated by early April 2001.  As to the injection phase, the Court has doubts as to whether the reduced side effects the Plaintiff suffered constitute an impairment that is both "severe" and of "permanent or long-term"so as to constitute a disability under the ADA.  *Toyota*, 534 U.S. at 198; *see also* 29 C.F.R. § 1630.2 Appx. (EEOC's Interpretive Guidance on Title I of the ADA) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza . . .  Thus, for example, a broken leg that takes eight weeks to heal is an impairment of fairly brief duration").  Several courts have found impairments that persisted only for a period of months and left no ongoing symptoms were insufficient to constitute a disability.  *See e.g. Carroll v. Xerox Corp.*, 294 F.3d 231, 240-41 (1st Cir. 2002) (anxiety disorder that restricted plaintiff's ability to work for three months), *citing Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996) (3½ month psychological impairment); *Durham v. City of Portland*, 213 F.3d 641, 2000 WL 328122 (9th Cir. 2000) (table) (impairment that was "severe" for six months and "moderate" for next four months insufficiently long-term or permanent to constitute disability); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir.1998) (cerebral hemorrhage requiring one-month hospital stay and six months home recuperation), *cited with approval in Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152,

26

1161 (10th Cir. 2002).  Even including the infusion phase, the entire course of the Plaintiff's impairment, from September 2000 to April 2001, lasted only eight months, with no residual impairment whatsoever.  Thus, it is highly unlikely that the Plaintiff's impairment during the entire treatment can be considered to be a severe and long-term or permanent disability under the ADA.

Third, the ADA requires an individualized assessment of a particular person's disability. *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 766 (10th Cir. 2006).  Particularly where a condition can have varying effects on those who suffer it, the factfinder may not make categorical assessments, but must consider the particular extent to which the Plaintiff personally experienced impairments.  *Id., citing Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566-67 (1999).  Here, a fair portion of Dr. Lee's testimony was presented in general terms as to what Interferon patients often experience.  Many of the Plaintiff's questions to Dr. Lee, especially those inquiring whether Interferon treatment would substantially limit various specified life activities, were either phrased by Plaintiff's counsel or answered by Dr. Lee in terms of Interferon patients generally, rather than addressing what the Plaintiff actually experienced.   Because Dr. Lee testified that Interferon affects different patients in different ways and degrees of severity, his testimony as to the general effects of Interferon on patients is not probative of the effects of the treatment suffered by the Plaintiff.  Thus, the Court focuses on the Plaintiff's own description of his symptoms, and Dr. Lee's testimony as to the symptoms he observed the Plaintiff experienced or the symptoms that the Plaintiff reported to him.

With these concerns in mind, the Court turns to the particular life activities identified by the Plaintiff.

a.  Breathing

There is limited evidence in the record regarding any impairment in the Plaintiff's ability to breathe.  The Plaintiff did not describe having any breathing problems during the injection phase. Dr. Lee's examination notes from January 10, 2001, during the injection phase, report that the Plaintiff had previously reported to the emergency room for symptoms that included shortness of breath, but neither the Plaintiff nor Dr. Lee testified as to the particular circumstances of this event.

The Plaintiff testified that, during the infusion phase, he "sometimes" experienced breathing difficulties.  The entirety of his testimony on this point consisted of the following:

> Q: Did it affect your ability to breathe?
>
> A:  Well, I – sometimes, I'd be trying breathing (sic) and then sometimes it was like – like somebody just put a quick plastic bag right over your nose and mouth and it was just no oxygen.

Dr. Lee also testified that, on one occasion, the Plaintiff reported shortness of breath as a symptom during the infusion phase.  Dr. Lee attributed this incident to fatigue brought on by the treatment.  There is no indication that either the Plaintiff or Dr. Lee considered these instances of shortness of breath to be especially severe or persistent.  Based on the totality of the record, the Court cannot find that a few isolated instances in which the Plaintiff experienced temporary shortness of breath is sufficient to establish that, at any time, he was significantly limited in the major life activity of breathing.

b.  Walking and balance

The evidence indicates that two side effects of the treatment impacted the Plaintiff's ability to walk: he experienced achiness and fatigue, and he occasionally lost his balance.  However,

there was little specific testimony on the extent to which the Plaintiff's ability to walk was impaired. Indeed, the only evidence in the record on this point is the fact that, on two occasions, the Plaintiff fell down while walking or climbing stairs.[11] Dr. Lee testified that the Plaintiff reported to him that on "a couple of occasions [ ] he had trouble with his balance and had fallen." The Plaintiff's wife also testified that "it was hard for him to walk" and that he had fallen down the stairs "a couple of times."

The Plaintiff's testimony was slightly different. After generally stating that his ability to walk was "extremely" affected, he stated that he had fallen down the stairs "probably more than a couple of times," but that he had only told his wife (and apparently Dr. Lee) about a couple of instances. No testimony addressed whether these falls occurred during the infusion or injection phase, but the Plaintiff testified that during the injection phase, he tended to take his injections before going to bed. The side effects were most severe in the six to seven hours following the injection, and thereafter, he would be fatigued, but that he "could get around."

The EEOC's regulations provide that a walking impairment becomes a disability only when the individual is so limited that he "can only walk for very brief periods of time." 29 C.F.R. § 1630.2(j) Appx. In an unpublished decision, the 10th Circuit has cited to several cases from other circuits that collectively establish that even moderate restrictions on the ability to walk do not amount to a substantial limitation. *See McCoy v. USF Dugan, Inc.*, 42 Fed.Appx. 295, 297 (10th Cir. 2002) (unpublished)[12], *citing Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir.

---

[11]The Plaintiff testified vaguely to "passing out" while walking, but did not specifically identify the circumstances of any particular incident other than those discussed here.

[12]Pursuant to 10th Cir. R. 36.3, the Court does not rely on *McCoy* for any precedential value, but rather, for its collection of caselaw from other circuits on the issue of walking

1999); *Penny v. United Parcel Service, Inc.*, 128 F.3d 408, 415 (6th Cir. 1997); *and Kelly v. Drexel Univ.*, 94 F.3d 102, 106 (3d Cir. 1996). Accordingly, the Court finds that there is insufficient evidence that the Plaintiff's walking difficulties rise to the level of a substantial impairment. Although the Plaintiff may have had to walk more slowly or more carefully than an average person as a result of fatigue and balance issues, he has not come forward with evidence that the limitations on his walking ability were so severe as to amount to a disability under the ADA.

    c.  Caring for himself

    The major life activity of caring for oneself encompasses a wide array of the normal activities of daily living, such as feeding oneself, driving, grooming, and cleaning home. *Holt*, 443 F.3d at 767. Proof that a person is impaired in performing a limited number of tasks within this category does not suffice to demonstrate a substantial impairment in the overall category of caring for oneself. *Id.*

    There is little evidence in the record regarding the Plaintiff's ability to care for himself. Indeed, the only evidence that appears to address this issue directly is testimony by the Plaintiff's wife that, "a couple of times" during the infusion phase, she came home to discover that the Plaintiff had had diarrhea and had soiled himself. There is also some general testimony that the treatment affected the Plaintiff's appetite and made him nauseous. These limited examples are

---

impairments. Moreover, the Court finds the facts of *McCoy* are extremely close to those presented here. In *McCoy,* the plaintiff claimed a walking impairment insofar as "her equilibrium was affected, she would have to hold on to the wall when walking, and she had fallen at various times." 42 Fed.Appx. at 297. Given the similar factual scenario presented here, a factual scenario this Court has not found addressed in any published decision by the 10th Circuit, *McCoy* has persuasive value warranting its citation under 10th Cir. R. 36.3(b). Pursuant to Rule 36.3(c), a copy of *McCoy* is attached hereto.

insufficient to establish that the Plaintiff was substantially impaired in his overall ability to care for himself, particularly during the injection phase.[13]

Dr. Lee was asked whether, in his opinion, the treatment "would affect Mr. Mower more so than the average person in the general population could take care of themselves."  Dr. Lee appeared to answer affirmatively, but he later qualified his answer in more general terms, stating "Yes.  When compared to the general public this -- I'm sorry.  The question has gotten so long now.  This is much more severe than a person who isn't undergoing Interferon, not to be questioned."

There are several reasons why this question and answer do not support a contention that the Plaintiff was substantially impaired in his ability to care for himself.  First, both the question and answer were grammatically awkward, making it difficult to determine precisely what question was being asked and what Dr. Lee's answer was.  Second, the question asked Dr. Lee whether the Plaintiff was "affected" in his ability to care for himself compared to the general public, not whether the Plaintiff was "limited" or "impaired" in that ability.  Third, the question was presented without any temporal qualifications.  As stated previously, the evidence clearly establishes that side effects during the relatively brief infusion phase were indeed severe, but that during the extended injection phase, such side effects were considerably lessened.  Moreover, as previously discussed, a substantial limitation on the ability to perform a major life activity must be permanent

---

[13]There is little doubt that the Plaintiff's ability to care for himself was much more impaired during the infusion phase than it was during the injection phase, where, the evidence shows, the Plaintiff was able to resume working full time.  However, as stated previously, the infusion phase was comparatively brief.  Because a disabling impairment must present "permanent or long-term" consequences, the Plaintiff's brief, temporary incapacitation during the infusion phase is insufficient to render him disabled during that period.

or long term before it becomes a protected disability.  Dr. Lee's testimony does not purport to

opine that the Plaintiff's impairment in his ability to care for himself satisfies this requirement.

Taken together, these matters prevent this testimony from Dr. Lee, even when interpreted in the

light most favorably to the Plaintiff, from establishing that the Plaintiff was substantially limited in

the major life activity of caring for himself.

      d.  Performing manual tasks

The major life activity of "performing manual tasks" encompasses "a variety of tasks

central to most people's daily lives," such as performing household chores, bathing, and brushing

one's teeth.  *Toyota*, 534 U.S. at 200, 201-02.  There is a large degree of overlap between the

tasks that comprise this activity and those that comprise the major life activity of caring for

oneself.  *Compare Toyota*, 534 U.S. at 201-02 (household chores and bathing are part of the

activity of performing manual tasks) *with Holt*, 443 F.3d at 767 (cleaning home and grooming are

part of the activity of caring for oneself).  The Court is aware of no evidence in the record that

refers specifically to tasks that the Court has not previously considered as part of the "caring for

oneself" analysis, and thus, the Court's finding of insufficient evidence to support a finding of

substantial impairment in that major life activity applies with equal force to the major life activity

of performing manual tasks.

      e.  Thinking

Assuming that "thinking" constitutes a major life activity – a matter that the 10th Circuit

has not definitively addressed, *see Lanman v. Johnson County*, 393 F.3d 1151, 1157 (10th Cir.

2004) – there is no evidence in the record to suggest that the Plaintiff was substantially limited in

his ability to think at any time.  Indeed, the record suggests quite the opposite.  The Plaintiff

continued to work from home during the severe side effects of the infusion phase, and was able to resume full-time work during the injection phase. Both activities are inconsistent with an assertion that the Plaintiff's ability to think was substantially impaired. There is no other evidence in the record to support a conclusion that the Plaintiff was substantially impaired in his ability to think.

### f. Sleeping

As with thinking, assuming sleeping is a major life activity, there is no evidence that the Plaintiff experienced limitations in his ability to sleep when compared with the average person. For example, there is no evidence that the Plaintiff's Interferon treatment (as opposed to his treatment at the hands of McCarthy) caused him to suffer insomnia or fitful sleep. In fact, the Plaintiff testified that, during the injection phase, he would take his treatment prior to going to bed, so that the side effects would occur when he would be asleep. Thus, there is no indication that the Plaintiff was substantially impaired in his ability to sleep.

### g. Interacting with others

Finally, the Plaintiff contends that he was impaired in his ability to interact with others. Assuming this is a major life activity, the Plaintiff would have to show that he was not only impaired in his ability to get along with certain coworkers, but that he had trouble getting along with people in general. *Steele*, 241 F.3d at 1255. He would have to demonstrate that his relations with others were, on a regular basis, characterized by severe problems, such as high levels of hostility, social withdrawal, or failure to communicate. *Id.; see also Doebele*, 342 F.3d at 1132. There is no clear evidence that supports this contention. The evidence established that, other than with McCarthy, the Plaintiff enjoyed good relations with most of the employees at the dealership

33

during and after his illness.  There is no indication that the Plaintiff had any difficulty interacting to members of the public, inside or outside of work.

Accordingly, there is no indication that the Plaintiff experienced significant limitation in any of his major life activities as a result of his illness and treatment.[14]   As such, he has not presented sufficient evidence to establish that he has a "disability" as that term is defined in the ADA.

Although he is not actually disabled under the terms of the ADA, the Plaintiff could nevertheless gain the law's protections if he had a record of having been disabled or if the Defendants regarded him as having a disability.  42 U.S.C. § 12102(2)(B), (C).   A person has a record of a disability where he has a history of actually having (or having been mistakenly classified as having) an impairment that substantially limits a major life activity.  *Doebele*, 342 F.3d at 1132; *see also* 29 C.F.R. § 1630.2(k).  A person may have a "record of" a disability if, at some point in the past, that person had (or was regarded as having) a sufficiently limiting impairment, even though that impairment no longer exists.  As with the general definition of "disability" under the ADA, a person proceeding under the "record of" approach must

---

[14]This is not to diminish, in any way, the discomfort the Plaintiff experienced throughout his treatment.  The Court has no doubt that the treatment, particularly during the infusion phase, was extremely uncomfortable and unpleasant, and the Plaintiff's resilience and determination to remain working during his treatment is impressive and admirable.  From a legal perspective, however, the Plaintiff's perseverance appears to work against him in establishing the existence of a disability under the ADA.  Arguably, had the Plaintiff chosen to meekly succumb to the debilitating side effects of the treatment, he would be in a better position to argue that he had a disability during this period.  Ironically, then, his largely successful struggled to overcome those side effects and remain a productive member of society throughout the treatment resulted in him having less antidiscrimination protection.  One might legitimately critique the ADA as bad social policy in this respect.  Nevertheless, the ADA reflects Congress' intent to focus on the real-world consequences of an impairment, rather than the existence of the impairment itself.  This Court must give effect to that intention.

nevertheless establish that the historical impairment was both severe in extent and long-term in duration. *Id.* (Logically, a "record of a disability" claim cannot require that the impairment be permanent, as the nature of "record of a disability" claims include situations where the impairment no longer exists.)  Here, as previously discussed, the actual "impairments" the Plaintiff suffered were the side effects of Interferon treatment.   The Court has already analyzed the evidence as of the end of 2000 and the beginning of 2001, and concluded that there is insufficient evidence that the Plaintiff had an actual disability at this time.  The Plaintiff does not assert that, prior to late 2000, he had a "record of" having undergone Interferon treatment, and thus, the Court cannot conclude that he had a "record of" a disabling impairment

Finally, an individual can establish that, although he is not disabled under the ADA's definitions, his employer "regarded" him as being so.  To establish a "regarded as" claim, an individual must show that his employer believed that the individual had an impairment that substantially limited the employee in a major life activity, even though the employee did not actually have such an impairment or that the employee's impairment was not actually so limiting. *See e.g. Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1162 (10th Cir. 2002).  In a "regarded as" claim, the focus is no longer on the objective evidence of the employee's impairment, but instead on the employer's subjective beliefs about that impairment.  *See e.g. Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir. 2001).  Thus, the Plaintiff must show that the Defendants believed him to be substantially limited in his ability to breathe, walk, care for himself, perform manual tasks, sleep, think, or interact with others.

Here, the Plaintiff offered very little evidence regarding the Defendants' perceptions of his physical condition in any respect.  There is evidence that, when the Plaintiff announced his

35

intention to return to work, McCarthy questioned whether his condition would permit him to perform the Finance Director's job, and required the Plaintiff to obtain a letter of clarification from Dr. Lee.  Obtaining clarification of a doctor's assessment of an individual's abilities does not demonstrate that the employer regards an individual as disabled, particularly where the employer abides by the doctor's assessment.  *See Rakity*, 302 F.3d at 1163 ("King Soopers' perception of Mr. Rakity was not based on speculation, stereotype or myth, but on the doctor's written evaluations of [Mr. Rakity's] condition") (internal quotes omitted).  Thus, McCarthy's demand for additional information from Dr. Lee about the Plaintiff's abilities does not support a "regarded as" claim.

Beyond that, there is no other evidence in the record that suggests that the Defendants subjectively believed that the Plaintiff's impairments substantially limited him, as compared to the average person, in any of the major life activities he has identified.  For example, there is no evidence that the Defendants thought that the Plaintiff's treatment prevented him from breathing, walking, or caring for himself as well as the average person.  There is evidence that Fowler told McCarthy to keep track of the Plaintiff's use of sick days, but such evidence does not bear on any of the categories of major life activities the Plaintiff has designated.  There is no question that McCarthy considered the Plaintiff to be weak and a "sickie," but the belief that an individual is weak or sick is not the equivalent of believing the individual to be substantially limited in a major life activity.  There is no specific evidence indicating, for example, that McCarthy thought the Plaintiff was diminished in his ability to care for himself, or to think or sleep.  Thus, the Plaintiff fails to adduce sufficient evidence to present a "regarded as" claim to the jury.

Having found that the Plaintiff did not present sufficient evidence to support a finding that he had a "disability" under any of the definitions of that term in the ADA, the Court grants judgment as a matter of law under Rule 50 to the Defendants on both of the Plaintiff's ADA claims.

2.   The Outrageous Conduct Claim

A claim for outrageous conduct lies under Colorado law where: (i) a defendant engages in extreme and outrageous conduct; (ii) does so recklessly, or with the intent to cause the plaintiff severe emotional distress; and (iii) the plaintiff suffers severe emotional distress as a result.  *Green v. Qwest Services Corp.,* ___ P.3d ___, 2006 WL 408308 (Colo. App. Feb. 23, 2006).  The Defendants' Rule 50 motion appears to be directed solely at the last element.[15]  They argued:

> There is no dispute that Mr. Mower did not see a healthcare provider, psychiatrist, psychologist or counselor for his alleged severe emotional distress.  He was not prescribed any medication for emotional distress.  He did not seek leave from Century as a result of emotional distress.  And Dr. Lee testified that Mr. Mower did not report to him that he was depressed or otherwise experiencing any mental distress.  It's Mr. Mower's burden to prove by a preponderance of the evidence that the emotional distress he suffered was in fact severe.  He has not done so.

The claim for outrageous conduct is modeled on the description of that claim in the Restatement (Second), Torts § 46. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1349-50 (Colo. 1988).  Comment *j* of the Restatement addresses the element the Defendants challenge here:

------

[15]The Defendants do not press a more common challenge in outrageous conduct cases: that the conduct in question is not sufficiently outrageous, and thus, the Court need not address that question.

37

> Emotional distress . . . includes all highly unpleasant mental
> reactions, such as fright, horror, grief, shame, humiliation,
> embarrassment, anger, chagrin, disappointment, worry, and nausea.
> It is only where it is extreme that the liability arises.  Complete
> emotional tranquility is seldom attainable in this world, and some
> degree of transient and trivial emotional distress is a part of the
> price of living among people.  The law intervenes only where the
> distress inflicted is so severe that no reasonable man could be
> expected to endure it.  The intensity and the duration of the distress
> are factors to be considered in determining its severity.  Severe
> distress must be proved; but in many cases the extreme and
> outrageous character of the defendant's conduct is in itself
> important evidence that the distress has existed.

Restatement (Second), Torts § 46, comment j.

The unrebutted evidence in the record is that the Plaintiff frequently cried, vomited, and had nightmares as a result of McCarthy's[16] treatment of him at work.  The Plaintiff's wife testified that she observed that the Plaintiff was depressed when he came home from work, and that on a couple of occasions, she found him crying.  She testified that he frequently told her that he was upset because of McCarthy's behavior.  Ackerman testified that the Plaintiff confided in her that he was humiliated by McCarthy's conduct, but felt he had to withstand it in order to keep his insurance coverage.  Taken in the light most favorably to the Plaintiff, this evidence suggests a degree of emotional distress that goes far beyond "transient and trivial."  Moreover, the repetition and outrageousness of McCarthy's conduct – conduct which, in most respects, the Defendants did not dispute occurred – is powerful evidence that the Plaintiff suffered severe emotional distress.

---

[16]Although the focus of the outrageous conduct claim was on McCarthy's behavior, the Court notes that there was evidence that Korjenek notified Fowler and the Defendants' attorneys of McCarthy's harassment, but the Defendants took no action to abate it.  Moreover, there is some circumstantial evidence from Koepke and Ackerman to suggest that Fowler may have actually conspired with McCarthy to force the Plaintiff out of his job.  For purposes of this Opinion, the Court's references to McCarthy's conduct can, where appropriate, be considered to also include acts and omissions by Fowler and the other Defendants.

Unrebutted evidence establishes that McCarthy purposefully and calculatedly engaged in a course

of conduct intended to humiliate and demean the Plaintiff and to force him to resign.  Numerous

witnesses testified, without contradiction, that McCarthy repeatedly and publicly ridiculed and

berated the Plaintiff, and suggested to other employees that the Plaintiff was lying about having

cancer so as to cover up drunkenness, moonlighting, or infidelity.  He mocked the Plaintiff by

suggesting that the Plaintiff's bleeding wound was actually ketchup.  Although the record is

disputed on the issue, there is corroborated evidence that McCarthy took advantage of the

Plaintiff's illness to force the Plaintiff to accept significantly reduced compensation and to exclude

the Plaintiff from management meetings and discussions.  Taken as a whole, the jury could

reasonably conclude from this evidence that the Plaintiff suffered severe emotional distress.[17]

The Defendants appear to suggest that, to demonstrate that he suffered severe emotional

distress, a plaintiff is required to seek medical or psychiatric treatment, and/or to take a leave of

absence to remove himself from the situation.  The Defendants do not offer any authority for this

proposition, and the Court is aware of none.  No such requirement appears in the Colorado Jury

Instructions, nor in the Restatement.  If anything, the Restatement suggests just the opposite: that

emotional distress need not be accompanied by observable physical consequences to be

---

[17]The jury was instructed that if they found that the Plaintiff was more susceptible to emotional distress than an ordinary person, and that McCarthy knew that to be the case, the jury could find that the Plaintiff suffered severe emotional distress from conduct that might not have affected a less-susceptible person so severely.  *See* Colorado Jury Instructions, 4th Ed. (Civil) § 23:4; *see also* Restatement (Second), Torts, § 46, comment j ("there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge").  Here, the jury could have found that the Plaintiff, having just survived life-threatening cancer and grueling treatment, was unusually susceptible to ridicule directed at his physical condition, and that the emotional distress caused by McCarthy's conduct was particularly severe in light of that susceptibility.

actionable.  Restatement (Second), <u>Torts</u>, § 46, comment k.  At best, the failure of a plaintiff to seek counseling or to attempt to extricate himself from the situation is a factor that the jury may weigh, along with all the other evidence, in determining whether a plaintiff has established that he suffered severe emotional distress.  The Defendants availed themselves of the opportunity to argue this evidence to the jury, highlighting in their closing statement that:

> Here's what the evidence shows:  Mr. Mower didn't see a healthcare provider for emotional distress, he didn't see a psychiatrist, a psychologist, a counselor.  He wasn't prescribed any medication for emotional distress.  He didn't ask for any leave from Century because of emotional distress.  But most telling was Dr. Lee's testimony.  Dr. Lee testified that depression can be a side effect of chemotherapy.  He does a physical exam during formal exams.  Look at his notes in the physical exam portion, the last line or the second last line relates to a psychiatric exam he does as part of his physical exam and every exam from June 19, 2000 to the most recent one in evidence says the same thing:  Alert and/oriented times 3, mood is appropriate.  He testified that Mr. Mower never reported any mental distress to him.

The verdict indicates that the jury rejected this argument in its entirety.  Absent the Defendants' citation to authority for the proposition that, as a matter of law, a plaintiff asserting a claim for outrageous conduct must seek out medical or psychological treatment in order to establish that he suffered severe emotional distress, the Court finds that the evidence warranted submission of the outrageous conduct claim to the jury.  The Defendants' Rule 50 motion with respect to the outrageous conduct claim is therefore denied.

### B.  Defendants' Motion for Remittitur and Plaintiff's Motion to Allocate Damages

Having granted judgment as a matter of law on the disability claims, the Court need address the remaining motions only with respect to the outrageous conduct claim.  If the jury's verdict appears to this Court to be excessive or otherwise against the weight of the evidence, the

Court may exercise its discretion to overturn the verdict and grant a new trial, unless the Plaintiff agrees to a reduction of the verdict. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996). The Court must engage in remittitur if the verdict is "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006) (ellipsis omitted).

The jury found that the Plaintiff suffered economic losses of $200,000 and non-economic losses of $400,000 on the outrageous conduct claim. The jury's award of damages – which included all of their findings of loss on every claim – indicates that the jury intended to compensate the Plaintiff for the entirety of these losses. Notably, the jury's findings of economic loss on this claim was substantially less than the $900,000 and $300,000 figures discussed by the Plaintiff's expert, and indeed, only slightly higher than the $160,000 figure discussed by the Defendants in their closing argument.

The Court does not find that an economic award of $200,000 for economic losses is excessive nor shocking to the conscience. The evidence established that McCarthy was successful in his attempts to force the Plaintiff out of his employment at Century, and the unrebutted evidence from Cadorette was that, even with subsequent employment factored in, the Plaintiff's economic losses were in excess of $300,000. Similarly, the Court finds nothing shocking about the jury's $400,000 award for non-economic losses. As has been repeatedly stated in this Opinion, there was unrebutted evidence that McCarthy engaged in a course of conduct towards the Plaintiff that could fairly be considered to be outrageous and intolerable, particularly in light of the Plaintiff's unusually vulnerable physical and emotional condition. The Plaintiff endured this

41

conduct for a period of four months before he felt compelled to resign.  One might reasonably argue that an award of $100,000 for each month that the Plaintiff endured McCarthy's abuse is generous, but in light of the unrebutted evidence that McCarthy's conduct was blatantly calculated, persistent, and tenacious, the Court certainly cannot say that such an award is shocking to its conscience or unreasonably excessive.  Accordingly, the Court finds that remittitur is not appropriate and denies the Defendants' motion.

To the extent that the Plaintiff's Motion to Allocate Damages retains any vitality in light of the granting of judgment to the Defendants on the disability claim, the Court denies that motion as well.[18]  The verdict form asked the jury to quantify both the amount they found the Plaintiff lost as a result of the conduct underlying each claim, and the total amount of damages that the jury awarded.  The Court can affirm the jury's award of damages to the extent that it reflects the jury's findings of economic and non-economic losses attributable to the outrageous conduct claim, but to the extent that the Plaintiff further requests that the Court apportion the award of damages so that the Plaintiff recovers more than the jury found he lost as a result of the outrageous conduct claim, the Court declines to do so.  Accordingly, to the extent it is not moot, the Plaintiff's Motion to Apportion Damages is denied.  The Court will affirm an award of damages to the Plaintiff on the outrageous conduct claim in the amount of $ 600,000.

## C.  Application of statutory caps and prejudgment interest

There are two Colorado statutes that impact on tort awards such as the one here.  C.R.S. § 13-21-102(1)(a) provides that, except in certain circumstances, *see* C.R.S. § 13-21-102(3), an

---

[18]The Court will address that portion of the motion that requests pre-judgment interest and attorney's fees separately.

award of punitive damages cannot exceed the amount of actual damages awarded.  C.R.S. § 13-21-102.5(3)(a) provides that awards for non-economic injuries shall not, except in certain circumstances, exceed a fixed amount, which, adjusted for inflation, *see* C.R.S. § 13-21-102.5(3)(c), is currently $ 366,250.

Turning first to the award of non-economic damages, the jury's award of $ 400,000 exceeds the statutory cap of $ 366,250.  The statute provides that the Court may allow an award to exceed the cap if it finds "justification by clear and convincing evidence therefor."  C.R.S. § 13-21-102.5(3)(a).  The statute is not clear as to what constitutes "justification" for exceeding the cap, and caselaw interpreting the statute appears to merely examine the nature and extent of the non-economic injuries.  *See e.g. Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631, 639 (Colo. App. 1998).  The nature of non-economic losses such as those awarded here defy easy quantification, and although the Court finds that the preponderance of the evidence supports the jury's award of $400,000 in non-economic damages, the Court does not find that the evidence of such losses was so clear and convincing to warrant an award in excess of the statutory cap.  The evidence as to the Plaintiff's non-economic losses was relatively minimal and anecdotal, with testimony primarily from the Plaintiff and his wife as to the Plaintiff's reactions to his treatment by McCarthy.  For example, there was no evidence that the Plaintiff continues to suffer ongoing emotional distress from McCarthy's treatment, nor testimony from any expert as to the nature and severity of the distress he suffered during or after his employment by the Defendants.  *Compare Colwell*, 973 P.2d at 639 (plaintiff adduced expert testimony of predicted future non-economic losses).  The jury's verdict awarding non-economic damages is certainly justified based on the Plaintiff and his wife's generalized lay testimony, but the Court finds this testimony insufficient to

meet the elevated standard required to exceed the statutory cap under C.R.S. § 13-21-102.5(3)(a).  Accordingly, the Plaintiff's non-economic award is reduced to $366,250 pursuant to C.R.S. § 13-21-102.5(3).  When combined with the jury's award of economic damages, the Plaintiff's total actual damages are $566,250.

Next, the Court calculates prejudgment interest on this award, as prejudgment interest is treated as a component of compensatory damage award.  *See Seaward Constr. Co. v. Bradley*, 817 P.2d 971, 976 (Colo. 1991); *James v. Coors Brewing Co.*, 73 F.Supp.2d 1250, 1255 (D. Colo. 1999).  C.R.S. § 13-21-101(1) provides for awards of prejudgment interest on tort claims, running from the date the cause of action accrued.  In this case, the Plaintiff's claim for outrageous conduct accrued no later than May 2001, when the Plaintiff left the Defendants' employment.  Under C.R.S. § 13-21-101(1), interest is awarded at a rate of 9%, compounded annually from the date the suit was filed.  *Francis ex rel. Goodridge v. Dahl*, 107 P.3d 1171, 1176 (Colo. App. 2005).

Using the formula set forth in *Francis*, the Court finds that simple interest from the accrual of the claim in May 2001 to the filing of the Complaint in August 2002 is $63,703.13.[19] This amount is added to the actual damage award of $566,250,[20] yielding a total of $629,953.13, and then subject to 9% interest, compounded annually, from August 2002 to today's date.  That figure yields a total of $ 876,748.39.[21]

---

[19]Damages of $ 566,250 x 1.25 years x .09 = $63,703.13

[20]Prejudgment interest is not calculated on punitive damages.  *Becker & Tennenbaum v. Eagle Restaurant Co.*, 946 P.2d 600, 602 (Colo. App. 1997); *Seaward*, 817 P.2d at 976.

[21]$ 629,953.13 x 1.09 (interest from August 2002 - August 2003) = $ 686,648.91 x 1.09 (from August 2003 - August 2004) = $ 748,447.31 x 1.09 (from August 2004 - August 2005) =

The Court now turns to Colorado's statutory cap on punitive damages. C.R.S. § 13-21-102 limits an award of punitive damages to the amount of actual damages awarded. Because the Plaintiff's total actual damages, including prejudgment interest, is in excess of the $800,000 awarded by the jury as punitive damages on the outrageous conduct claim, the Court need not consider the Plaintiff's argument that C.R.S. § 13-21-102(3)(b) warrants an adjustment to the statutory cap. The Plaintiff's total actual damages, including prejudgment interest, of $876,748.39, plus the jury's $ 800,000 award of punitive damages, yields a total judgment in favor of the Plaintiff in the amount of $ 1,676,748.39.

### D. Attorney's fees

The Plaintiff request for attorney's fees arises from the ADA claims. Because the Court grants judgment to the Defendants on these claims, the Plaintiff is not a prevailing party entitled to attorney's fees under the statute. Colorado law does not generally provide for an award of attorney's fees to successful tort plaintiffs. *Beebe v. Pierce*, 521 P.2d 1263, 1265 (Colo. 1974). Accordingly, the Plaintiff is not entitled to an award of attorney's fees.

The Defendants have requested an award of fees based on their status as prevailing parties on the Plaintiff's claim under the Colorado Wage Claim Act. C.R.S. § 8-4-104(3). The Court granted summary judgment to the Defendants on this claim (**# 49**). As it existed at the time of the filing of the Complaint,[22] the Wage Claim Act provided that "the judgment in [an action under the

_____

$815,807.57. A full year's interest at 9% on $ 815,807.57 is $73,422.68, and that amount must be reduced by 2/12 or .17 to $60,940.82 to reflect interest on the partial year from August 2005 to June 2006. $815,807.57 + $60,940.82 = $ 876,748.39.

[22]The Colorado Wage Claim Act was substantially revised in August 2003. Laws 2003, Ch. 286, § 1. The Court has previously held (**# 49**) that, in absence of argument by the parties to the contrary, the Court will apply the provisions of the Act as they existed at the time the action

Act] shall include a reasonable attorney fee in favor of the winning party." C.R.S. § 8-4-114

(repealed).  The statute was intended to have reciprocal effects, indemnifying the successful wage

claimant from attorney's fees and protecting the employer against nuisance litigation.  *Voller v.*

*Gertz*, 107 P.3d 1129, 1132 (Colo. App. 2004).  The "winning party" is the litigant who receives

relief on the merits.  *Id.*; *Van Steenhouse v. Jacor Broadcasting of Colorado,* 958 P.2d 464, 468

(Colo. 1998).

There is no question that the Defendants prevailed on the merits of the Plaintiff's Wage

Claim Act claim.  However, the Plaintiff contends that, overall, he was the prevailing party in the

litigation as a whole, and that his overall success trumps the Defendants' narrow victory on the

Wage Claim Act.  The Plaintiff's reliance on *Van Steenhouse* for this proposition is misplaced.  In

*Van Steenhouse*, there was no adjudication on the Wage Claim Act claim; the plaintiff withdrew

the claim after receiving a check for unpaid salary from the defendant during the course of

litigation, and the parties proceeded to trial on an unrelated claim on which the plaintiff was

ultimately successful.  958 P.2d at 468-69.  The Colorado Supreme Court affirmed the denial of

attorney's fees under the Wage Claim Act to either party, finding that "neither party prevailed to

the extent necessary to justify an award of attorney's fees."  *Id.* at 469.  Contrary to the Plaintiff's

suggestion, nothing in *Van Steenhouse* indicates that the Court should look to the degree of

success the parties obtained on non-Wage Claim Act claims in determining an entitlement to

attorney's fees under that statute.  The Colorado Supreme Court's observation that "neither party

prevailed" is based on the fact that the plaintiff's Wage Claim Act was withdrawn prior to an

was commenced.  *See e.g. Academy of Charter Schools v. Adams County School Dist.*, 32 P.3d
456, 466 (Colo. 2001) (changes in law to be given prospective effect only unless legislature
indicates contrary intent).

adjudication on the merits. Here, there was an adjudication on the merits of the Wage Claim Act, and the Defendants prevailed. Accordingly, the Defendants are entitled to attorney's fees under that statute, notwithstanding the Plaintiff's success on other, unrelated claims.

The Defendants request fees in the amount of $ 78,736.50. In response to the motion, the Plaintiff does not challenge the hourly rates requested by the Defendants, but asserts that, according to the billing statements, "almost all of the fees being sought were necessarily incurred in defending this action in its entirety." *Docket* # 146 at 6. This line of argument is unavailing. In *Hartman v. Community Responsibility Center, Inc.*, 87 P.3d 254, 256-57 (Colo. App. 2004), the court affirmed an award of fees to the plaintiff that included not only attorney time spent pursuing the plaintiff's successful Wage Claim Act claim, but also time spent by the plaintiff responding to the defendant's counterclaims. The court observed that the counterclaims were essentially defenses to the wage claim, and thus, "to prevail on her wage claim, Hartman had to defeat CRC's defense . . . based on counterclaims." *Id.* at 257. Thus, this Court understands *Hartman* to stand for the proposition that where attorney's fees incurred on a wage claim and other intertwined claims are not severable, the Court may award attorney's fees for time spent on all claims.

Here, the Plaintiff's initial Complaint asserted a number of claims that revolved around two major poles: several claims sounding in employment discrimination, and several claims sounding in tort and contract relating to the modification of the Plaintiff's compensation plan. Thematically, the claims relating to the Plaintiff's compensation plan, including the claim for unpaid wages under that plan, turned on the same set of facts and are legally intertwined. Indeed, in its summary judgment ruling (**# 49**), the Court grouped those claims together for analysis.

47

Thus, as in *Hartman*, it is appropriate to award the Defendants attorney's fees for all work spent defending all of the compensation-based claims.  However, the discrimination claims were not legally or factually intertwined with the wage claim, and thus, it would be inappropriate to award attorney's fees to the Defendants on the discrimination claims.

The Defendants contend in their motion that they have excluded all time entries relating to the discrimination claims, and that the time requested relates only to the compensation claims. The Court has reviewed the Defendants' billing statements and finds this assertion to be overly optimistic.  Although the Defendants have excluded time entries whose subject matter clearly references the discrimination claims, it has included numerous entries that refer to work performed on the litigation generally.  For example, in December 2002, there are numerous entries that refer to "claims/damages/defenses memorandum."  *Docket* # 143, Ex. 2 at 18.  There is no clear indication that all of the time memorialized by these entries relates solely to the compensation claims.  Similarly, many entries involve time spent generally administering the litigation – preparing office files, attending scheduling conferences, etc. – that would have been incurred in any lawsuit, whether a wage claim was involved or not.  The Court must not only exclude time that is attributable to the discrimination claims, but must also exclude time spent on general administrative matters.  Because the Defendants would necessarily have incurred these administrative expenses even if the "nuisance" of a meritless wage claim had not been included in the litigation, the purposes of the Wage Claim Act would not be served by assessing attorney's fees against the Plaintiff where the litigation would nevertheless have been brought on the discrimination claims anyway.

Given both their number and their generality, it is impossible to make entry-by-entry adjustments that will ensure that only time spent addressing the compensation claims remains. Thus, the Court finds that a proportional reduction of the Defendants' request is the only way to adequately determine the fees to which the Defendants are entitled. Based on the Court's knowledge of the issues, the Court finds that the compensation claims and the discrimination claims were roughly equal in the time they required for analysis and preparation. For example, the mostly document-based compensation claims required fairly extensive written discovery, but relatively little deposition development. By contrast, the mostly testimony-based discrimination claims required extensive depositions, but comparatively little document discovery. Both sets of claims involved a roughly equivalent number of discrete claims and legal and factual issues to be explored. However, the Court must also account for time spent on general administrative matters incident to any litigation. In the Court's opinion, such administrative tasks may account for as much as 20% of the time spent by counsel on the case. Thus, it is appropriate to reduce the total amount of fees claimed by the Defendants by 20% to reflect general administrative time that would have been incurred even if the wage claim had not been brought, and to attribute 50% of the remaining time to the wage claim and its related claims.

The Defendants' motion indicates they billed a total of $110,382.50 in fees on all matters in this case prior to the granting of summary judgment on the wage claim. If 20% of those fees are attributable to basic administration of the litigation, the fees attributable to addressing substantive claims is $88,306. Dividing that amount in half yields $44,153 in time attributable to addressing the wage claim and related claims. Considering the totality of the circumstances, the Court finds this to be a reasonable approximation of the amount of attorney's fees incurred by the

49

Defendants in responding to the Plaintiff's Wage Claim Act claim, and those additional claims inextricably intertwined with it.  The Defendants are entitled to recover this sum against the Plaintiff pursuant to the former C.R.S. § 8-4-114.

## CONCLUSION

For the foregoing reasons, the Defendants' oral motion pursuant to Fed. R. Civ. P. 50, renewed in writing **(# 138)** is **GRANTED IN PART**, insofar as the Defendants are entitled to judgment as a matter of law on the Plaintiff's claims under the ADA, and **DENIED IN PART**, insofar as the Plaintiff presented a sufficient claim for outrageous conduct.  The Plaintiff's Motion for Damages and Entry of Judgment **(# 139)** is **GRANTED IN PART**, insofar as the Court makes an award of prejudgment interest as set forth herein and enters judgment in favor of the Plaintiff, and **DENIED IN PART** in all other respects as moot.  The Defendants' Motion for Remittitur **(# 140)** is **DENIED**.  The Plaintiff's Motion for Increased Damages Pursuant to C.R.S. § 13-21-102 and § 13-21-102.5 **(# 141)** is **DENIED**.  The Defendants' Motion for Application of Statutory Caps **(# 142)** is **GRANTED IN PART**, insofar as the Plaintiff's non-economic damage award is reduced to $ 366,250, and **DENIED IN PART** in all other respects.  The Defendants' Motion for Attorney's Fees Under the Colorado Wage Claim Act **(# 143)** is **GRANTED IN**

**PART**, insofar as the Defendants are entitled to attorney's fees in the amount of $ 44,153, and

**DENIED IN PART** to the extent the Defendants seek fees in excess of that amount.  The Court

will enter judgment as set forth herein simultaneously with entry of this Opinion and Order.

Dated this 16th day of June, 2006

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

Westlaw.

42 Fed.Appx. 295                                                                        Page 52
42 Fed.Appx. 295, 2002 WL 1435908 (C.A.10 (Kan.))
**(Cite as: 42 Fed.Appx. 295)**

**H**

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,Tenth Circuit.

Ellen McCOY, Plaintiff-Appellant,

v.

USF DUGAN, INC., Defendant-Appellee.

**No. 01-3189.**

July 3, 2002.

Former employee brought Americans With Disabilities Act (ADA) action against employer. The United States District Court for the District of Kansas, 2001 WL 579820, granted employer's motion for summary judgment. Employee appealed. The Court of Appeals, Porfilio, Circuit Judge, held that employee did not show that she was disabled or regarded as disabled within meaning of ADA.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ☞1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
                78k1218 Who Is Disabled;  What Is Disability
                    78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases
    (Formerly 78k173.1)
Former employee with multiple sclerosis which prevented her from bowling, dancing, playing tennis, or riding bicycle and could affect her equilibrium was

not substantially limited in her ability to walk for purposes of showing disability under ADA, where defendant was still physically and psychologically capable of walking and she admitted that her difficulties in walking had not affected her ability to work since she had left her job with employer. Americans with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. § 12102(2); 29 C.F.R. § 1630.2(j)(1, 2).

**[2] Civil Rights 78 ☞1218(3)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
                78k1218 Who Is Disabled;  What Is Disability
                    78k1218(3) k. Particular Conditions, Limitations, and Impairments. Most Cited Cases
    (Formerly 78k173.1)
Former employee's with inability to lift over twenty pounds was not disabled within meaning of ADA. Americans with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. § 12102(2); 29 C.F.R. § 1630.2(j)(1, 2).

**[3] Civil Rights 78 ☞1218(6)**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
                78k1218 Who Is Disabled;  What Is Disability
                    78k1218(6) k. Perceived Disability; "Regarded As" Claims. Most Cited Cases
    (Formerly 78k173.1)
Former employee's allegations that supervisor once referred to her as lame and asked others whether her medication was fogging her focus was not sufficient to show that employer regarded her as disabled due to her multiple sclerosis within meaning of ADA. Americans

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with Disabilities Act of 1990, § 3(2), 42 U.S.C.A. §12102(2); 29 C.F.R. § 1630.2(*l* ).

Before SEYMOUR, PORFILIO, and BALDOCK, Circuit Judges.

**\*296 ORDER AND JUDGMENT** [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.PORFILIO, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff Ellen McCoy appeals from an order of the district court granting defendant's motion for summary judgment in this action brought pursuant to the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. Ms. McCoy apparently alleged defendant had violated the ADA by demoting her and that she was constructively discharged.[FN1] We affirm.

FN1. Ms. McCoy did not include a copy of her complaint in the appendix she submitted to this court. We glean her allegations from her brief on appeal and the brief she submitted in response to defendant's motion for summary judgment.

Ms. McCoy began working for defendant as an accounts receivable clerk in January 1993. She was diagnosed with multiple sclerosis in March 1995. [FN2]

The only accommodation Ms. McCoy requested as a result of her disease was a parking space closer to the building. That request was immediately granted.

FN2. Multiple sclerosis does not automatically qualify as a disability under the ADA. *See Sorensen v. Univ. of Utah Hosp.,* 194 F.3d 1084, 1086-88 (10th Cir.1999).

The district court granted summary judgment to defendant. The court determined that Ms. McCoy had failed to establish she was a qualified individual with a disability and she had failed to show she suffered any adverse employment action. The court rejected defendant's additional contention that Ms. McCoy was not adequately performing her job due to conflicting evidence as to this fact.

On appeal, Ms. McCoy argues she established a prima facie case of both discrimination and of constructive discharge in violation of the ADA. She further contends she presented a genuine issue of material fact on the issue of pretext, thus entitling her to proceed to trial.

"We review the entry of summary judgment de novo, drawing all reasonable inferences in favor of the nonmovants." *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994). The moving party must show "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." *Id.* (quotation omitted). The nonmovant must establish, at a minimum, "an inference of the presence of each element essential to the case." *Id.* Although we must resolve doubts in favor of the non-moving party, "conclusory allegations standing alone will not defeat a properly supported motion for summary judgment." *White v. York Int'l Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, ----,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). To qualify for relief under the ADA, Ms. McCoy "must first establish that [s]he is a qualified individual with a disability." *Steele v. Thiokol Corp.,* 241 F.3d 1248, 1253 (10th Cir.2001). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions**297** of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In order for a physical or mental impairment to be "substantially limiting," the individual must be
****2** (i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

To aid in this assessment, the evaluator must consider the type and severity of the impairment, the length of time the impairment has lasted or is expected to last, and the expected permanent and/or long term impact of the impairment, 29 C.F.R. § 1630.2(j)(2), as well as any mitigating or corrective measures. *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305-06 (10th Cir.1999).

Ms. McCoy alleges that her multiple sclerosis substantially limited her major life activities of walking and lifting. She also argues that she was regarded as being so impaired. *See Sorensen,* 194 F.3d at 1088.

[1] In support of her position that she was substantially limited in her ability to walk, Ms. McCoy testified at her deposition that she could no longer bowl, dance, play tennis, or ride a bicycle. Further, when she had a flare-up of her multiple sclerosis, her equilibrium was affected, she would have to hold on to the wall when walking, and she had fallen at various times.

Courts have held that moderate restrictions on the ability to walk do not amount to a substantial limitation. *See Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (limping, "mov[ing] at a significantly slower pace than the average person," and difficulty walking in extreme cold do not constitute a substantial impairment); *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir.1997) ("moderate difficulty or pain experienced while walking does not rise to the level of a disability"); *Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3d Cir.1996) (inability to walk "more than a mile or so," to jog, and need to go slowly up stairs does not constitute substantial limitation in walking); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(j) (walking is substantially limited if individual "can only walk for *very brief* periods of time" (emphasis added)).

Ms. McCoy's limitation in walking is not substantially limited as required by the ADA. She is still "physically and psychologically capable of walking." *Steele,* 241 F.3d at 1254. Further, she testified at her deposition that her difficulties in walking have not affected her ability to work since leaving defendant's employment.

[2] Ms. McCoy alleged she could not lift over twenty pounds. Lifting has been held to be a major life activity. *See Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 21 (1st Cir.2002). However, the "inability to lift heavy objects does not constitute a substantial limitation on a person's overall ability to lift [as the] capacity to perform heavy lifting is not a trait shared by the majority of the population." *Id.* at 22 (citations omitted). As the First Circuit noted:
***298 **3** strength varies widely throughout the population, and if a restriction on heavy lifting were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

42 Fed.Appx. 295                                                                                    Page 55
42 Fed.Appx. 295, 2002 WL 1435908 (C.A.10 (Kan.))
**(Cite as: 42 Fed.Appx. 295)**

considered a substantial limitation on a major life activity, then the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape. Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some particularly difficult manual task.

*Id.* at 22-23.

Ms. McCoy has not shown that she was substantially limited in the major life activity of lifting. *See e.g., Thompson v. Holy Family Hosp.,* 121 F.3d 537, 539-40 (9th Cir.1997) (twenty-five pound lifting restriction not substantially limiting).

[3] In the alternative, Ms. McCoy argues that defendant regarded her as substantially limited in her ability to perform her job. Plaintiff points out that her supervisor once referred to her as "lame" and asked others whether her medication was "fogging" her focus, despite the fact that she was on no medication. An individual is regarded as having an impairment that substantially limits a major life activity if the individual is treated as if he or she had such an impairment, whether he or she does or not. 29 C.F.R. § 1630.2(*l* ). Ms. McCoy's assertions "fall[ ] far short of raising a triable issue that [she] was regarded by h[er] employer as being substantially limited in h[er] ability to" perform her job. *Steele,* 241 F.3d at 1256.

As Ms. McCoy has not made a prima facie case that she is disabled, we need not reach the question whether there was any discriminatory adverse action in the form of a constructive discharge. We also need not address whether she set forth sufficient facts to show defendant's actions were merely pretextual.

The judgment of the United States District Court for the District of Kansas is AFFIRMED.

C.A.10 (Kan.),2002.
McCoy v. USF Dugan, Inc.
42 Fed.Appx. 295, 2002 WL 1435908 (C.A.10 (Kan.))

Briefs and Other Related Documents (Back to top)

• 01-3189 (Docket) (Jun. 25, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.